FILED
Apr 10 2020
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY s/ Josepht DEPUTY

EUGENE IREDALE
Iredale and Yoo, APC
105 W F St, Fl 4
San Diego, CA 92101
Telephone: (619) 233-1525

*Counsel for Amici Curiae*

SUSANNA M. BUERGEL (*pro hac vice forthcoming*)
sbuergel@paulweiss.com
DARREN W. JOHNSON (*pro hac vice forthcoming*)
djohnson@paulweiss.com
DAVID C. KIMBALL-STANLEY (*pro hac vice forthcoming*)
dkimball-stanley@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

ISSIS YOSELIN ZELAYA SAGASTUME; MIGUEL BENITEZ; YUSUF OZDEMIR; and JANE DOE,

Petitioners-Plaintiffs,

v.

GREGORY J. ARCHAMBEAULT, San Diego Field Office Director, Immigration and Customs Enforcement; JAMES DOBSON, Otay Mesa Detention Center Officer in Charge, Immigration and Customs Enforcement; JESUS RENA, Calexico Assistant Field Office Director, Immigration and Customs Enforcement; CHRISTOPHER J. LAROSE, Senior Warden, Otay Mesa Detention Center; SIXTO MARRERO, Facility Administrator, Imperial Regional Detention Facility; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director of Immigration and Customs

Case No. 3:20-cv-00658-BAS-RBB

**BRIEF OF *AMICI CURIAE* PUBLIC HEALTH AND HUMAN RIGHTS EXPERTS**

Enforcement; CHAD WOLF, Acting Secretary of Homeland Security,

Respondents-Defendants.

TABLE OF CONTENTS

Table of Authorities ........ ii

I. Introduction ........ 1

II. Statement of Interest of *Amici Curiae* ........ 2

III. Factual Background ........ 4

IV. Argument ........ 4

A. The COVID-19 Pandemic Requires Proactive Social Distancing Measures ........ 4

B. Detention Centers Are at a Heightened Risk for the Spread of COVID-19 ........ 6

C. IHSC's Recommendations to Combat COVID-19 Are Inadequate ........ 9

V. Conclusion ........ 11

# TABLE OF AUTHORITIES

**Page(s)**

**AUTHORITIES**

*38 Positive for Coronavirus at Rikers, NYC Jails*, AP News (Mar. 22, 2020), https://apnews.com/54dbc9d47f62cf0c0240314310cfe909 .................... 7

*A Rikers Inmate Has Died of Complications from the Virus*, N.Y. Times (Apr. 5, 2020), https://www.nytimes.com/2020/04/05/nyregion/coronavirus-new-york-update.html#link-3236f5ee. ........................................................ 7

Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an American Catastrophe*, The Atlantic (Mar. 21, 2020), https://www.theatlantic.com/health/archive/2020/03/how-many-americans-are-sick-lost-february/608521/ ......................................................... 6

Andrew Jacobs, et al., *'At War With No Ammo': Doctors Say Shortage of Protective Gear Is Dire*, N.Y. Times (Mar. 19, 2020) https://www.nytimes.com/2020/03/19/health/coronavirus-masks-shortage.html ...................................................................................... 9

Bianca Malcolm, *The Rise of Methicillin-Resistant Staphylococcus aureus in U.S. Correctional Populations*, Journal of Correctional Health Care (May 13, 2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3116074/; .............................. 7

Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Cases and Latest Updates, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html ................................................................................................ 6

Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Situation Summary (2020), https://www.cdc.gov/coronavirus/2019-ncov/summary.html ......................... 5, 6

David Reuter, *Swine Flu Widespread in Prisons and Jails, but Deaths Few*, PRISON LEGAL NEWS (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deaths-are-few/; ........................................ 7

Federal Bureau of Prisons, Clinical Practice Guidelines: Management of Methicillin-Resistant Staphylococcus aureus (MRSA) Infections 1-2 (April 2012), https://www.bop.gov/resources/pdfs/mrsa.pdf ....................... 8

Hamed Aleaziz, *A Local Sheriff Said No To More Immigrant Detainees Because of Coronavirus Fears. So ICE Transferred Them All To New Facilities*, BuzzFeed News (Mar. 18, 2020), https://www.buzzfeednews.com/article/hamedaleaziz/wisconsin-sheriff-ice-detainees-coronavirus. .......... 7

Hamed Aleaziz, *A Staff Member At A Facility Housing Unaccompanied Immigrant Children Has Tested Positive for the Coronavirus*, BuzzFeed News (Mar. 19, 2020), https://www.buzzfeednews.com/article/hamedaleaziz/staff-member-coronavirus-diagnosis-unaccompanied-immigrant .......... 7, 10

Immigration and Customs Enforcement Health Service Corps, Interim Reference Sheet (Mar. 6, 2020), https://www.aila.org/File/DownloadEmbeddedFile/84066 .......... 9

Kenji Mizumoto & Gerardo Chowell, *Estimating Risk of Death from 2019 Novel Coronavirus Disease, China, January–February 2020*, 26 Emerging Infectious Diseases, no. 6, June 2020, https://doi.org/10.3201/eid2606.200233 .......... 5

Neil M. Ferguson et al., Imperial College of London, Impact of Non-Pharmaceutical Interventions (NPIs) to Reduce COVID-19 Mortality and Healthcare Demand 7 (2020), https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-fellowships/Imperial-College-COVID19-NPI-modelling-16-03-2020.pdf .......... 5, 6

Pam Belluck, *What Does Coronavirus Do to the Body?*, N.Y. Times (Mar. 18, 2020), https://www.nytimes.com/article/coronavirus-body-symptoms.html .......... 6

Sarah Mervosh et al., *See Which States and Cities Have Told Residents to Stay Home*, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/20/us/ny-ca-stay-home-order.html. .......... 5

Stephanie M. Lee, *Nearly 900 Immigrants Had The Mumps In Detention Centers In The Last Year*, Buzzfeed News (Aug. 29, 2019) https://www.buzzfeednews.com/article/stephaniemlee/mumps-ice-immigrant-detention-cdc .......... 7

World Health Organization, Coronavirus Disease (COVID-19) PANDEMIC (2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019 .................. 5

## I. Introduction

*Amici Curiae* Robert L. Cohen, M.D., Joe Goldenson, M.D., Kathryn Hampton, MSt, and Ranit Mishori, M.D., a group of public health officials and human rights experts who are familiar with the unique dangers associated with infectious diseases in detention facilities, strongly urge this Court to grant petitioners' Petition for Writ of Habeas Corpus (Dkt. # 1), and to order defendants to work with local health authorities to release petitioners, whose continued detention puts them at high risk of contracting COVID-19, in accordance with the most recent CDC guidance on personal protection equipment, quarantine and isolation protocols. Releasing such at-risk detainees not only will protect petitioners and other detainees, but also detention facility staff, visitors, and the public at large.

COVID-19 is an extremely infectious disease. It has created an unprecedented global health crisis and led to the adoption and implementation of novel but necessary mitigation strategies around the world, including the canceling of public events, the closing of schools and businesses, and stay-at-home orders to the general public. There is no vaccine or cure for COVID-19. The virus has proven that it can infect and seriously harm anyone. And yet it also is clear that some categories of people are at higher risk than others. In particular, the likelihood that a COVID-19 infection will be serious or life-threatening is much higher if the infected person has a high-risk health profile, such as advanced age or certain underlying illnesses.

Managing the spread of COVID-19 within detention facilities is critically important because they are enclosed environments, like cruise ships, that are highly susceptible to epidemics. In the case of COVID-19 specifically, the only way to mitigate the risk of serious infection is through hygienic measures like frequent hand washing and social distancing to limit exposure. But those prevention methods are all but impossible in a detention facility setting, in which detainees are crowded together, sharing bathroom products, and where sanitizing products are

infrequently used. And once an outbreak occurs, detention facilities are rarely equipped to provide the intensive care and support needed to treat patients suffering from a severe COVID-19 infection.

Acting quickly to mitigate the enormous risk associated with detention centers is not just necessary to protect detainees themselves, but also to protect staff and visitors. Moreover, because staff and visitors cycle in and out of detention facilities, if appropriate mitigation measures are not taken immediately, those individuals risk spreading the disease to the broader community. Accordingly, the time to act is now, before it is too late.

## II. Statement of Interest of *Amici Curiae*

*Amici curiae* are experts in infectious diseases, healthcare policy, correctional healthcare, human rights and other related fields who have spent decades studying the provision of healthcare in detention facilities. Based on their experience, and their review of the available information about the COVID-19 pandemic, it is their view that the plaintiffs in this action are at high risk of serious, life-threatening COVID-19 infection, and that their continued confinement in the Otay Mesa and Imperial detention centers puts them at a heightened risk of contracting and further spreading COVID-19.

*Amici* are committed to ensuring detention facilities provide quality healthcare to detainees, and that detention facilities do not exacerbate the health risks of their detainees. They understand the COVID-19 pandemic has placed enormous strains on society, and are committed to doing their part to ensure that detention facilities take a prudent, science-based approach to addressing the virus. They respectfully submit this brief to offer their view that defendants should work with state and local health officials to release individuals to whom COVID-19 poses a high risk of serious infection.

*Amici* are the following:

Robert L. Cohen, M.D., has worked as a physician, administrator and expert in the care of prisoners for 40 years. Dr. Cohen was the Director of the Montefiore Rikers Island Health Services from 1981 through 1986. In 1986, he was appointed Vice President for Medical Operations of the New York City Health and Hospitals Corporation. Dr. Cohen represented the American Public Health Association on the Board of the National Commission for Correctional Health Care for 17 years. He has served as a federal court-appointed monitor overseeing efforts to improve medical care for prisoners in Florida (*Costello* v. *Wainwright*), Ohio (*Austin* v. *Wilkinson*), New York (*Milburn* v. *Coughlin*) and Michigan (*Hadix* v. *Caruso*). He also has been appointed to oversee the care of all prisoners living with HIV in Connecticut (*Doe* v. *Meachum*). He currently serves on the nine member New York City Board of Correction, which regulates and oversees New York City's detention facilities.

Kathryn Hampton, MSt, is Senior Officer of the Asylum Program at Physicians for Human Rights. In that capacity, she coordinates Physicians for Human Rights' Asylum Network Program, an initiative that recruits, trains and supports a network of clinicians to provide forensic evaluations for asylum seekers and to advocate for human rights-based immigration policies. She has over 10 years of experience in human rights monitoring, analysis, and reporting.

Ranit Mishori, M.D., is senior medical advisor at Physicians for Human Rights (PHR), and Professor of family medicine at the Georgetown University School of Medicine, where she directs the department's Global Health Initiatives and Health Policy fellowship. She has over 20 years of public and primary care experience working with immigrants, asylum seekers, incarcerated and formerly incarcerated individuals. At Georgetown, she leads the School of Medicine's Correctional Health Interest group, where she supervises medical students placed at jails, prisons and detention centers. In addition, she is the director of Georgetown University's Asylum program which focuses on both the care and medico-legal

issues of asylum seekers, including immigration detention. She has written extensively and given talks and lectures about these issues nationally and internationally. She has reviewed and analyzed dozens of legal cases related to health outcomes of individuals in correctional facilities, and advised multiple organizations (civil society, legal aid organizations and the media) about issues related to incarceration, including hunger strikes, medical care quality, communicable disease management, violence, and the care of pregnant women.

## III. Factual Background

*Amici* adopt and incorporate by reference the factual background set forth in petitioners' Petition for Writ of Habeas Corpus (Dkt. # 1).

## IV. Argument

### A. The COVID-19 Pandemic Requires Proactive Social Distancing Measures

The COVID-19 pandemic is an ongoing pandemic of coronavirus disease 2019 that is caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). The novel coronavirus that causes COVID-19 first emerged in the province of Hubei, China in December 2019.[1] As of April 9, 2020, there were 1,439,516 confirmed cases and 85,711 deaths in 212 countries, areas or territories worldwide.[2] Due to the apparent ease with which the virus spreads, these numbers will continue to rise exponentially without drastic government action.[3]

---

1 Kenji Mizumoto & Gerardo Chowell, *Estimating Risk of Death from 2019 Novel Coronavirus Disease, China, January–February 2020*, 26 Emerging Infectious Diseases, no. 6, June 2020, https://doi.org/10.3201/eid2606.200233.

2 World Health Organization, Coronavirus Disease (COVID-19) PANDEMIC (2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019.

3 *See* Centers for Disease Control and Prevention, Situation Summary (2020), cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fsummary.html.

The consensus of doctors and epidemiologists since the emergence of COVID-19 as a global pandemic has been that the only way to gird against spread of the virus is to take proactive and early action to "flatten the curve."[4] Accordingly, a leading and frequently cited report from the Imperial College London has suggested that "suppression will minimally require a combination of social distancing of the entire population, home isolation of cases and household quarantine of their family members," in addition to school and university closures.[5] In other words, social distancing is necessary at every level, including the institutional level. Given the speed with which the virus spreads, such social distancing measures may have to last approximately 18 months until a vaccine is successfully developed.[6] It is for precisely this reason that dozens of state governments have instituted mandatory social distancing policies in recent days; indeed, three in four Americans is now under order to stay home.[7]

Although these measures are welcomed and necessary, they would have been more effective if governments had acted proactively, rather than merely prescriptively.[8] The United States now has over 427,460 cases and over 14,696

---

[4] *See, e.g.*, Neil M. Ferguson et al., Imperial College of London, Impact of Non-Pharmaceutical Interventions (NPIs) to Reduce COVID-19 Mortality and Healthcare Demand 7 (2020), https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-fellowships/Imperial-College-COVID19-NPI-modelling-16-03-2020.pdf.

[5] *Id.* at 1.

[6] *Id.* at 15.

[7] Sarah Mervosh et al., *See Which States and Cities Have Told Residents to Stay Home*, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/20/us/ny-ca-stay-home-order.html.

[8] *See* Impact of Non-Pharmaceutical Interventions (NPIs) to Reduce COVID-19 Mortality at 3 ("Cities in which these interventions were implemented early in the epidemic were successful at reducing case numbers while the interventions remained in place and experienced lower mortality overall.").

fatalities.[9] The COVID-19 virus has wreaked havoc all over the United States, jeopardizing both the health and economic wellbeing of millions of Americans.[10] The worst-case scenario in the Imperial College study above suggests that the United States could suffer up to 2.2 million deaths as a result of the COVID-19 crisis.[11] Emerging data suggests that 16% of people infected with COVID-19 will develop serious illness. About 1% of infected persons die.[12] Even those patients who ultimately recover might suffer from permanent damage to their lungs and other vital organs.[13] Accordingly, extreme social distancing should not only be practiced, but also mandated and enforced by all levels of government and their institutions.

### B. Detention Centers Are at a Heightened Risk for the Spread of COVID-19

Detention centers, which are enclosed environments in which it is impossible to implement and enforce social distancing guidelines, are at a heightened risk for the spread of COVID-19. Numerous public health officials have recognized that outbreaks of contagious diseases are more common in detention settings than in communities at large.[14] COVID-19 almost certainly will be no

---

9 Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Cases and Latest Updates, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

10 *See generally* Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an American Catastrophe*, The Atlantic (Mar. 21, 2020), https://www.theatlantic.com/health/archive/2020/03/how-many-americans-are-sick-lost-february/608521/.

11 Impact of Non-Pharmaceutical Interventions (NPIs) to Reduce COVID-19 Mortality at 7.

12 Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Situation Summary (2020), https://www.cdc.gov/coronavirus/2019-ncov/summary.html.

13 Pam Belluck, *What Does Coronavirus Do to the Body?*, N.Y. Times (Mar. 18, 2020), https://www.nytimes.com/article/coronavirus-body-symptoms.html.

14 *See* David Reuter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010),

exception. Indeed, confirmed cases of COVID-19 already have emerged in multiple detention and correctional facilities, including the Cook County Jail in Chicago, which is now the nation's largest-known source of coronavirus infections.[15]

The enormity of the problem is exacerbated by the fact that staff, visitors, contractors and vendors all pass between communities and detention facilities, and each group can bring infectious diseases into those facilities. Moreover, the detainees themselves have to make court appearances and, each time they appear, they risk contracting infections and introducing them into the detention facility upon return. Additionally, detention facility populations are constantly turning over, as detainees cycle in and out of detention, with each new detainee potentially carrying COVID-19 and introducing it into the facility's population. This

---

https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deaths-are-few/; Bianca Malcolm, *The Rise of Methicillin-Resistant Staphylococcus aureus in U.S. Correctional Populations*, Journal of Correctional Health Care (May 13, 2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3116074/; Stephanie M. Lee, *Nearly 900 Immigrants Had The Mumps In Detention Centers In The Last Year*, Buzzfeed News (Aug. 29, 2019) https://www.buzzfeednews.com/article/stephaniemlee/mumps-ice-immigrant-detention-cdc.

[15] Timothy Williams & Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars*, N.Y. Times (Apr. 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html; *see also 38 Positive for Coronavirus at Rikers, NYC Jails*, AP News (Mar. 22, 2020), https://apnews.com/54dbc9d47f62cf0c0240314310cfe909; Article, *A Rikers Inmate Has Died of Complications from the Virus*, N.Y. Times (Apr. 5, 2020), https://www.nytimes.com/2020/04/05/nyregion/coronavirus-new-york-update.html#link-3236f5ee; Emily Kassie, *First ICE Employee Tests Positive for Coronavirus*, Marshall Project (Mar. 19, 2020), https://www.themarshallproject.org/2020/03/19/first-ice-employee-tests-positive-for-coronavirus; *see also* Hamed Aleaziz, *"A Staff Member At A Facility Housing Unaccompanied Immigrant Children Has Tested Positive for the Coronavirus,"* BuzzFeed News (Mar. 19, 2020), https://www.buzzfeednews.com/article/hamedaleaziz/staff-member-coronavirus-diagnosis-unaccompanied-immigrant.

problem is especially acute in the context of immigration detention facilities, where it is common to see detainees transferred between facilities, which creates a risk of detention facilities spreading the virus throughout the system.[16]

These factors, all of which make it effectively impossible for detention facilities to protect themselves from outbreaks outside their walls, are made worse by the fact that it is difficult to identify and isolate those individuals who are infected with COVID-19, because they may suffer from only mild symptoms or even be entirely asymptomatic, but still be carrying and spreading the disease. And, unfortunately, detention facilities typically do not have the ability to perform the kind of systematic testing that would be required to ensure that the virus does not enter the facility.

The unique attributes of detention facilities also make it impossible for those facilities to adopt and implement the mitigation efforts that have become a necessary safeguard of life outside those facilities. That is because immigration detention facilities are enclosed environments, much like the cruise ships that have proven susceptible to COVID-19 outbreaks. The social distancing that has been the hallmark of the United States' COVID-19 prevention efforts is simply not possible in such a setting. Detainees share close quarters, including dining halls, bathrooms, showers and other common areas, each presenting dangerous opportunities for transmission.[17] Additionally, spaces within detention facilities often are poorly

---

[16] *See* Hamed Aleaziz, *A Local Sheriff Said No To More Immigrant Detainees Because of Coronavirus Fears. So ICE Transferred Them All To New Facilities*, BuzzFeed News (Mar. 18, 2020) (ICE recently transferred 170 immigrant detainees from Wisconsin to facilities in Texas and Illinois. "'In order to accommodate various operational demands, ICE routinely transfers detainees within its detention network based on available resources and the needs of the agency…' an ICE official said in a statement."), https://www.buzzfeednews.com/article/hamedaleaziz/wisconsin-sheriff-ice-detainees-coronavirus.

[17] Poor inmate hygiene has in previous years led to staph infection outbreaks, spread by, *inter alia*, the shared use of soap and towels and person-to-person contact via contaminated hands. *See* Management of Methicillin-Resistant Staphylococcus

ventilated, which promotes the spread of diseases. Other hygiene-based prevention strategies are similarly ineffective in a detention setting. Detainees will not typically have access to sufficient soap and alcohol-based sanitizers to engage in the kind of frequent hand washing encouraged throughout the rest of the country. And staff often do not clean or sanitize high-touch surfaces like door handles or light switches.

Once an outbreak occurs, it will be too late for under-resourced detention facilities to defeat the virus. COVID-19's most common symptoms are fever, cough and shortness of breath. Serious cases can develop that require invasive measures to improve respiratory function, including the use of highly specialized equipment like ventilators. While serious infections have developed in all demographics, they are much more likely to become necessary when dealing with high-risk populations. The COVID-19 virus has put ventilators in high demand and short supply around the world, and the virus even has led to shortages of less specialized equipment such as face masks and gloves.[18]

The necessary treatment for those infected with COVID-19, especially those in high-risk populations, is labor-intensive. It would only allow nurses to tend to one or two patients at a time, and may require physicians with specialized backgrounds in respiratory care. Immigration detention facilities are unable to address these needs. In fact, such facilities often employ nurses who practice beyond the scope of their licenses, and part-time physicians who have limited availability to be on-site. The novel coronavirus outbreak is already straining hospital capacity across the country. That problem will be dangerously exacerbated if detention facilities do not act immediately to release those detainees who are at the greatest risk of serious infection.

---

aureus (MRSA) Infections, Federal Bureau of Prisons Clinical Practice Guidelines, 1-2 (April 2012), https://www.bop.gov/resources/pdfs/mrsa.pdf.

[18] *See* Andrew Jacobs, et al., *'At War With No Ammo': Doctors Say Shortage of Protective Gear Is Dire*, N.Y. Times (Mar. 19, 2020) https://www.nytimes.com/2020/03/19/health/ coronavirus-masks-shortage.html

Even once individuals infected with COVID-19 have been identified within a detention facility population, it nonetheless remains safer for the most vulnerable individual detainees (as well as detention facility staff, visitors and the public at large) if those at-risk detainees are released, rather than kept in the detention facility, where the outbreak is likely to spread. Detention centers are extraordinarily high risk environments for the transmission of infectious diseases, making it highly unlikely that the spread of an outbreak, once begun, can be contained within the detention facility. The unique circumstances presented within these facilities, coupled with the frequent, close contact between detainees and staff makes it highly likely that any outbreak amongst detainees would ultimately spread to non-detained personnel that go back and forth between detention centers and the outside world (even if at-risk individuals are not themselves released). The close physical contact required in order for detention center staff to treat the most at-risk individuals, once they become infected, only raises the risk that an outbreak will spread from detainees to staff.

Given these circumstances, releasing at-risk detainees is the safest approach for detainees, staff and the public, even once known infections have been identified. Once an outbreak has begun within a detention facility, the likelihood that an at-risk individual will eventually become infected increases substantially. Release lowers the risk that detention-facilities' already-burdened healthcare infrastructure will become overwhelmed by the additional care required by these vulnerable individuals. Likewise, proactive release lowers the likelihood that regional hospitals and health centers that are already stretched thin treating the general population will be forced to bear the brunt of treating these at-risk individuals once they have become infected.

### C. IHSC's Recommendations to Combat COVID-19 Are Inadequate

ICE Health Service Corps ("IHSC") is the entity responsible for overseeing medical care in ICE detention facilities. On March 6, 2020, IHSC

released interim guidelines to combat COVID-19. Those guidelines, however, are inadequate in light of the serious concerns outlined above.[19] Among other things, the guidelines: focus on questioning detainees about travel and potential contact with individuals with COVID-19, even though the disease is already widely spread; fail to include simple measures recommended by the CDC to stop the spread of infections in institutional settings, such as access to hand sanitizer and use of masks for those with coughs; fail to advise detention facility staff on planning for surges as illness spreads, even though that spread will inevitably result in an increase in patients and a decrease in staff due to illness; fail to advise detention facility staff on when to test for COVID-19; establish protocols for isolating and monitoring detainees with COVID-19 as if it will be a rare occurrence, even though many or most new detainees likely already have been exposed to the virus; provide no guidance or special protections for high-risk patients when they enter detention; and provide no guidelines for identifying high-risk patients who are already in detention.[20]

In short, the IHSC guidelines fall far short of setting forth the sort of comprehensive and proactive social distancing measures, described above, that are necessary to prevent viral spread. And, indeed, viral spread already appears to be happening,[21] including in San Diego's immigration detention facilities.[22] Because

---

19 *See* Immigration and Customs Enforcement Health Service Corps, Interim Reference Sheet (Mar. 6, 2020), https://www.aila.org/File/DownloadEmbeddedFile/84066.

20 *Id.*

21 *See, e.g.*, Emily Kassie, *First ICE Employee Tests Positive for Coronavirus*, Marshall Project (Mar. 19, 2020), https://www.themarshallproject.org/2020/03/19/first-ice-employee-tests-positive-for-coronavirus; *see also, e.g.*, Hamed Aleaziz, *A Staff Member At A Facility Housing Unaccompanied Immigrant Children Has Tested Positive for the Coronavirus*, BuzzFeed News (Mar. 19, 2020), https://www.buzzfeednews.com/article/hamedaleaziz/staff-member-coronavirus-diagnosis-unaccompanied-immigrant.

22 Kate Morrissey and Andrea Lopez-Villafana, *Employee at Otay Mesa Detention Center Tests Positive for COVID-19*, The San Diego Union Tribune (Mar. 31, 2020), https://www.sandiegouniontribune.com/news/immigration/story/2020-03-31/employee-at-otay-mesa-detention-center-being-tested-for-covid-19-aftershowing-symptoms.

of the particular risks facing detention facilities, the current IHSC approach will result in many preventable illnesses and deaths—in particular among older individuals and individuals with preexisting illnesses. Other governments appear to have recognized this risk and acted accordingly.[23] ICE must do the same in order to stop the spread of COVID-19 in its detention facilities and protect those who are most vulnerable to the illness.

---

23 *See, e.g.*, Craig McCarthy, *NYC to Release 300 More Riker's Inmates Amid Coronavirus Pandemic*, N.Y. Post (Mar. 25, 2020), https://nypost.com/2020/03/25/nyc-to-release-300-more-rikers-inmates-amid-coronavirus-pandemic/.

## V. **Conclusion**

*Amici* urge the Court to consider this information when assessing whether to grant petitioners' Petition for Writ of Habeas Corpus. In particular, *amici* urge the Court to grant the Petition and order defendants to release detainees, including petitioners, thereby reducing overcrowding and mitigating the public health effects to those individuals, facility staff and the public at large. Release should be coordinated with local public health authorities, in accordance with the most recent CDC guidance on personal protection equipment, quarantine and isolation protocols, so as to ensure the safety of the released detainees and the community.

Dated: April 9, 2020

IREDALE AND YOO, APC

By: ______________________________

EUGENE IREDALE
Iredale and Yoo, APC
105 W F St, Fl 4
San Diego, CA 92101
Telephone: (619) 233-1525

Susanna M. Buergel (*pro hac vice forthcoming*)
Darren W. Johnson (*pro hac vice forthcoming*)
David C. Kimball-Stanley (*pro hac vice forthcoming*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
sbuergel@paulweiss.com
djohnson@paulweiss.com
dkimball-stanley@paulweiss.com

*Counsel for Amici Curiae*